Filed 3/16/15  P. v. Steward CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JASON J. STEWARD,<br><br>Defendant and Appellant. | B254834<br><br>(Los Angeles County<br>Super. Ct. No. TA123374) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Shultz, Judge.  Affirmed.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Jason J. Steward challenges his sentence of 36 years to life following his conviction for driving under the influence of alcohol causing injury to others in violation of Vehicle Code section 23153, subdivisions (a) and (b). He contends the trial court abused its discretion by refusing to strike his prior strike convictions at sentencing. We affirm.

**FACTUAL BACKGROUND**

On May 27, 2012, the day before Memorial Day, Juan Carlos Martinez, his wife Lynzne, and his three young children—eight-year-old Brianna, three-year-old Loryana, and infant Aiden[1]—attended a barbecue at the house of their family friend Oscar Angues, Jr., in Los Angeles. The family stayed overnight, and around 7:00 a.m. the next morning, Angues, Jr., started to drive the family home in his Chevy Tahoe. His father, Oscar Angues, Sr., rode with them. Angues, Jr., stopped at a stop sign at the end of his street and looked for cross-traffic. He saw a white Cadillac about a block away. Believing it was safe, he turned left. As he turned, he realized the Cadillac was coming at him fast. The Cadillac lost control, swerved across the yellow line into his lane, and hit the Tahoe. Angues, Jr., tried to avoid the collision and flipped the Tahoe onto its side.

During the crash, Angues, Jr., blacked out. When he woke up, he was able to get himself out of the Tahoe. He saw Brianna lying on the street and saw Loryana's "head sticking out the back window." He tried to render assistance to Brianna, but she had passed away. After the crash, Juan was in a daze. He saw Lynzne lying near the Cadillac, which had come to a stop up against a nearby building, and when he approached her, he knew she had passed away. Angues, Jr., saw appellant crawl out of the passenger side of the Cadillac and cursed at him. He then saw appellant trying to flee from the scene by "kinda limping and running at the same time." He pursued appellant and saw him hide under a truck. Officers arrived and, after appellant refused

---

[1]     We refer to the members of the Martinez family by their first names for clarity. No disrespect is intended.

2

to come out from under the truck, they pulled him out.[2]  Angues, Jr., identified appellant at the scene.  At no point did appellant assist any of the victims.

As stipulated at trial, Lynzne, Brianna, and Loryana all died as a result of the crash. Everyone else was seriously injured.  Juan suffered a mild traumatic brain injury, blunt force trauma to the head, a fracture of the lower left tibia, and a fracture of the top of the left shin bone.  Aiden was admitted to the pediatric intensive care unit at Long Beach Memorial Hospital, where he was treated for head trauma, facial contusions, a contusion to the left front lobe of his brain, and a subarachnoid hemorrhage of the left parietal lobe of the brain.  Angues, Sr., suffered two broken ribs, a bilateral nasal bone fracture, and a thumb fracture.  Angues, Jr., suffered blunt force trauma to the head, a dislocated clavicle, and soft tissue injuries to his head, right knee, left neck, and left shoulder.  Appellant suffered a fracture of his lower leg bone just above his ankle, abrasions to his forehead, right knee, wrist, forearm and shin, and a hematoma on the anterior skull.

Both cars had "black box" modules that recorded their speeds just before the crash.  At five seconds before the crash, appellant's Cadillac was traveling at 83 miles per hour; at four seconds, it was traveling at 86 miles per hour; at three seconds, it was traveling at 90 miles per hour; at two seconds, it was traveling at 92 miles per hour; and at one second, it was traveling at 89 miles per hour.  In contrast, at five seconds before the crash, Angues, Jr.'s Tahoe was moving at four miles per hour; at four seconds, it was moving at two miles per hour; at three seconds, it was moving at three miles per hour; at two seconds, it was moving at 10 miles per hour; and at one second, it was moving at 16 miles per hour.  There was no posted speed limit for the street where the crash occurred, but a reasonable speed would have been 40 or 45 miles per hour. Although the investigating officer could not say definitively whether Angues, Jr., came to a full stop at the stop sign, he opined appellant was "most at fault" in the collision.  Presuming

---

[2]      The parties stipulated Angues, Jr., told officers he caught up with appellant and pushed him down.  Appellant crawled under a car, and Angues, Jr., could not get him out.  Angues, Jr., then flagged down a police officer, pointed appellant out, and described what appellant was wearing.

Angues, Jr., had come to a full stop; the investigating officer stated appellant would have been solely at fault.

At the hospital after the accident, appellant appeared to be intoxicated. The parties stipulated that a blood sample taken from him on that day showed a blood alcohol level of 0.29 percent. At that level, a person would be mentally impaired to operate a motor vehicle. Appellant had previously been arrested on March 16, 2012, for driving under the influence of alcohol after he rear-ended another car at a sobriety checkpoint. At the time of the current collision, his license was suspended due to a "DUI."

## PROCEDURAL BACKGROUND

Appellant was charged with nine counts, including three counts of murder (Pen. Code, § 187, subd. (a)),[3] three counts of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)), one count of driving under the influence causing injury (Veh. Code, § 23153, subd. (a)), one count of driving with a blood alcohol level of more than 0.08 percent causing injury (Veh. Code, § 23153, subd. (b)), and one count of leaving the scene of an accident (Veh. Code, § 20001, subd. (a)). The jury found appellant guilty of the two counts of driving under the influence causing injury and driving with a blood alcohol level more than 0.08 percent causing injury, and found true enhancements for personal infliction of bodily injury (§ 12022.7, subd. (a)), and proximately causing great bodily injury (Veh. Code, § 23558). The jury deadlocked on the remaining counts and the trial court declared a mistrial on them.[4] In a bifurcated proceeding, the court found true appellant had two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), one prior serious felony conviction (§ 667, subd. (a)(1)), and one prior conviction for which he served a prison term (§ 667.5, subd. (c)).

---

[3]     All undesignated statutory citations are to the Penal Code unless otherwise noted.

[4]     At one point during deliberations, the jury returned guilty verdicts on the manslaughter charges, which the trial court sealed and did not read into the record pending further deliberations on the other counts. The jury continued to deliberate, during which the trial court returned those verdicts to the jury without reading them. The jury was permitted to reconsider those counts and ultimately deadlocked on them.

Prior to sentencing, appellant moved to strike one of his two prior strike convictions pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*). According to the prosecutor at the sentencing hearing, the two convictions occurred in 1999 following an armed robbery with a codefendant, during which appellant was personally armed with a firearm and placed the gun to a victim's head and demanded money as she and her companion were leaving her office. Appellant was convicted of attempted robbery of one victim, who had nothing of value, and robbery of the second victim, from which he took a purse and other personal items.[5] He was sentenced to 12 years in prison. He was released on parole in February 2010, and while he was still on parole, he was arrested at the DUI checkpoint in March 2012, for driving under the influence of alcohol. Then, while the case for that arrest was pending, he committed the instant crimes.

In support of the motion, defense counsel argued appellant fell outside the spirit of the "Three Strikes" law because his prior strikes arose out of a single incident in 1999, and since being released from prison, he has been "relatively crime free." Counsel also reiterated appellant's defense at trial that appellant did not cause the accident because Angues, Jr., failed to completely stop at the stop sign before pulling into the intersection.

The prosecutor responded that the evidence reflected Angues, Jr., fully stopped at the stop sign. The only equivocal evidence was the investigating officer's opinion that it was possible Angues, Jr., might have rolled through the stop sign at one to two miles per hour. But based on the prosecutor's posttrial discussions with hung jurors, causation was not the issue; instead, the jurors "were not following the law and exercising jury nullification." The prosecutor argued the motion should be denied based on the nature of the current convictions for causing great bodily injury while driving under the influence of alcohol and appellant's "complete disregard for the law, despite prior warnings and opportunities . . . his entire adult life."

---

[5] Appellant has not suggested this description was incorrect, so we will accept it as accurate.

The court denied the motion, reasoning as follows:

"All right. Just to be clear, the court lacks discretion to dismiss the five-year prior that's been alleged under [section] 667[, subd.] (a). However, the court does retain discretion to dismiss the prior strike conviction from 1999. That was 13 years ago. The defendant was sentenced to 12 years in state prison. Based upon [the prosecutor's] representation, he was released sometime around February of 2010 and then in rather short order picked up two D.U.I.'s, one, which would be a simple, non-aggravating D.U.I. and the one that we have present before us.

"There was a very brief period of time elapsed between the time the defendant was released from prison and began his criminal conduct, ending with this conduct, which, of course, ended three people's lives and injured others.

"In order for me to strike or dismiss the strike, the court must determine that the defendant is eligible for relief because he's outside the scheme of the third strike law. And I find that that is not the case here.

"I want to address one issue with respect to causation. In terms of the numbers, I know, [defense counsel], you had indicated that the jurors had hung nine-three on the murder charges.

"[Prosecutor], you didn't enumerate whether the hang that you were referring to involved the vehicular manslaughter charges. But it really doesn't matter for this court's purposes of dismissing or striking or consider[ing] dismissing or striking the prior strikes.

"I heard all the evidence in this case. I understood the defense position with respect to causation, and I rejected it entirely.

"If the victim did run the stop sign, if—and I say that because you had indicated, [defense counsel], that it's unrefuted. It was not unrefuted. The expert who testified and even the expert who testified in the [Evidence Code section] 402 hearing indicated that they could not rule out that the driver of that vehicle did stop. All because of the timing of the black box, what they know is that at the moment that the data was recorded, the vehicle was traveling at two miles an hour.

"That two miles an hour is extraordinarily slow. It is the speed at which many people walk.

"So even if it were true that the vehicle did run the stop sign at two miles an hour, one still has to ask whether or not the defendant's conduct of driving under the influence and driving with such a high blood alcohol level—and, [prosecutor], I believe you said 91 miles an hour. The top speed that I remember was 92 miles an hour, barreling down the street. That is outrageous conduct. That is conduct, in my mind, without a doubt is a substantial factor in the accident.

"Whether the jurors hung because they felt causation was an issue or whether they hung because this was jury nullification is irrelevant to me because I heard the evidence. And that the evidence to me, without a doubt, was that the defendant was a substantial factor in the accident. The same causation also applied to the counts he was convicted of. And they found those counts true. Or they found him guilty of those counts as well as true for the [great bodily injury] allegation.

"So that is not—the issue of causation is not even a factor when considering whether or not the defendant is outside the scheme.

"The court looks at the nature of the prior conviction in this case. It was a violent felony. The defendant utilized a gun, personally utilized a gun during the commission of the robbery, and the court looks to the current conviction. Here there were three [great bodily injury] allegations found true as a result of the defendant's conduct. And notwithstanding the fact that the jury was deadlocked on the murder and manslaughter charges, I will remind everybody that the jurors did return three guilty verdicts on the manslaughter charges. But for the court not reading them into the record they would have been sustained convictions.

"So, as I've indicated to all of you, I took responsibility for that by sealing them and unsealing them. However, we know at least at one point during the trial they had intended on finding the defendant guilty of the manslaughter.

"In any event, the current conviction is what is unrefuted and clear, is that he was driving 92 miles an hour down the street. Some might call it a residential or an industrial street. There were certainly houses there. There were people there. There were cars there. And in this case the defendant struck it, injuring people within the car, that's what he's been convicted of, and killing people as well.

7

"I have to consider the defendant's unique background and prospect for the future. He's been incarcerated for most of the last 15 years. It was only during the brief two-year period of time that he was not incarcerated that he picked up both of these cases.

"And any other mitigating or aggravating factors, I find no mitigating factors for the defendant and just an entire list of aggravating factors based upon the circumstances of this current offense.

"With that said, the defense motion to strike or dismiss the prior strike convictions that were found true is denied."

The court sentenced appellant to 36 years to life, which was comprised of 25 years to life for the Vehicle Code section 23153 conviction pursuant to the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)); plus three years consecutive pursuant to section 12022.7, subdivision (a); plus three years consecutive pursuant to Vehicle Code section 23558; plus five years pursuant to section 667, subdivision (a). The court imposed and stayed the sentence on the remaining count and struck the section 667.5, subdivision (b) enhancement. Appellant timely appealed.

## DISCUSSION

Under *Romero*, a trial court retains discretion to strike or vacate prior felony conviction allegations in furtherance of justice. (*People v. Williams* (1998) 17 Cal.4th 148, 158.) In exercising this discretion to strike a prior conviction under the Three Strikes law, the court must consider "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Id.* at p. 161.) We review the trial court's refusal to strike a prior strike conviction for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 371.) A trial court "does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.)

The trial court in this case properly considered the relevant factors and acted within its discretion in refusing to strike appellant's prior convictions. The circumstances of his current

convictions were egregious. While driving with a suspended license due to a pending DUI arrest, appellant drove his vehicle at the extraordinary speed of up to 92 miles per hour on a city street for which a reasonable speed according to the investigating officer was 40 or 45 miles per hour. He had a blood alcohol level of 0.29 percent after the crash, nearly four times the legal limit of 0.08 percent. (Veh. Code, § 23152, subd. (b).) He hit a car carrying seven people, killing three of them, including two small children, and injuring the rest. Then he attempted to flee the scene of the accident.

As he did at trial and again at sentencing, appellant argues his reckless drunk driving was not a "substantial factor" in the collision because Angues, Jr., may have rolled through the stop sign at two or three miles per hour. Like the trial court, we reject his assessment of the evidence. Angues, Jr., Angues, Sr., and Juan all testified Angues, Jr., stopped at the stop sign. Based on the Tahoe's black box, the investigating officer could not say for certain whether Angues, Jr., came to a complete stop, but even if he had not, the investigating officer opined appellant was "most at fault" in the collision. We share the trial court's view that even if Angues, Jr., had rolled through the stop sign at two or three miles per hour, appellant's reckless and irresponsible behavior was a substantial factor causing the deaths and injuries to the Tahoe's occupants. We are also unmoved by the fact the jury asked multiple questions, asked for some testimony readback, and deadlocked on the murder and manslaughter counts. Appellant's primary defense at trial was the claimed lack of causation, which applied equally to the murder and manslaughter counts as well as the counts for which the jury found him guilty. We cannot say whether the hung jurors engaged in nullification to cause a deadlock on the murder and manslaughter counts, but we can say they must have been concerned about some issue other than causation, which was common to both the deadlocked counts and the counts for which the jury returned convictions.

None of the other relevant factors supported striking appellant's prior convictions. His prior felony convictions were violent, given appellant was personally armed with a firearm and placed the gun to a victim's head to demand money. Although the convictions occurred in 1999, appellant was in prison until February 2010, and in a relatively short two-year period after that, he had been arrested for driving under the influence in March 2012, and while that case was

9

pending and his license was suspended, he drove under the influence of alcohol again, causing the fatal collision at issue here. Finally, while he may have only been 34 years old at the time of sentencing, he repeatedly exercised extremely poor judgment and showed a tendency to commit crimes, so the trial court acted well within its discretion in finding his 36 years to life sentence appropriate.[6]

## DISPOSITION

The judgment is affirmed.


FLIER, J.

WE CONCUR:


RUBIN, Acting P. J.


GRIMES, J.

---

[6] For the first time on appeal, appellant suggests in passing that the prior strikes should be stricken because they "arose from one 1999 case," citing *People v. Benson* (1998) 18 Cal.4th 24, 36, footnote 8, among other cases. Footnote 8 in *Benson* suggested one of two prior strike convictions may be stricken if they arise out of the same act. Our Supreme Court has since held that two prior convictions arising out of a single act against a single victim cannot constitute two strikes under the Three Strikes law. (*People v. Vargas* (2014) 59 Cal.4th 635, 637-639.) These cases are inapposite here because appellant's prior robbery and attempted robbery convictions involved different acts and victims. Thus, they could be considered separate strikes. (*Id.* at p. 638 [two convictions based on separate acts may be considered two strikes even if they are closely connected, tried in the same proceeding, or committed during the same course of conduct].)